**IN THE UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GROUPON GOODS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EDO TRADING, INC., and EDWARD | )    **Case No. 22-cv-1609** |
| MINASYAN, | ) |
| | ) |
| | )    **DEMAND FOR JURY TRIAL** |
| | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AT LAW

Plaintiff GROUPON GOODS, INC. ("Groupon"), by and through its

undersigned counsel, and for its Complaint at Law against Defendants EDO

TRADING, INC. ("EDO") and EDWARD MINASYAN ("Minasyan"), states as

follows:

## Introduction

1.     EDO entered into an agreement with Groupon to supply it with certain

products for sale on Groupon's online marketplace. As part of that agreement, EDO

was authorized to use Groupon's FedEx account for the sole purpose of shipping

Groupon products. Unbeknownst to Groupon, EDO and Minasyan engaged in the

unauthorized use of Groupon's FedEx account to make over 27,000 shipments of

non-Groupon ordered goods and products. Due to EDO's and Minasyan's unlawful

and unauthorized conduct, Groupon has incurred charges for the shipment of non-

Groupon products exceeding $525,000. EDO and Minasyan facilitated this scheme to defraud Groupon by falsely representing to FedEx that Groupon was the responsible payor for these shipping charges related to non-Groupon products. EDO and Minasyan have admitted that they engaged in the unauthorized use of Groupon's FedEx account, but have nevertheless refused to pay back the amounts that they unlawfully charged on Groupon's FedEx account.

### Parties

2.      Groupon is a corporation organized under the laws of the State of Delaware with its principal place of business in Chicago, Illinois. Groupon operates the Groupon Goods Marketplace, an online marketplace that provides a platform for third parties to sell their products to buyers. Prior to January 2021, Groupon also purchased products from vendors and sold such products to consumers itself through the Groupon Goods Marketplace. Groupon is a subsidiary of Groupon, Inc., a global leader of online local commerce that connects consumers to local businesses offering goods and services.

3.      EDO is a corporation organized under the laws of the State of California. EDO's principal place of business is in Los Angeles, California. EDO sells various products online.

4.      Minasyan is the chief executive officer and chief financial officer of EDO. He is domiciled in southern California.

**Jurisdiction and Venue**

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs. Groupon is a Delaware corporation with its principal place of business in Chicago, Illinois. EDO is a California corporation with its principal place of business in Los Angeles, California. Minasyan is a citizen of California.

6.      This Court has personal jurisdiction over EDO because it agreed that the "exclusive jurisdiction" for any disputes arising out of or relating to its agreements with Groupon is the "federal and state courts in Cook County, Illinois." See Exhibit A, Groupon Goods Gateway Master Option to Purchase Agreement (the "Option Agreement"); Exhibit B, Groupon Goods Vendor Guide (the "Vendor Agreement") at ¶ 23(b) (collectively referred to herein as the "parties' Agreements"). Additionally, this Court has personal jurisdiction over both defendants because they do business in this judicial district, including engaging in contractual negotiations and other business activities related to their commercial relationship with Groupon.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because EDO has contractually agreed to litigate any disputes between the parties in the "federal and state courts in Cook County, Illinois." See Exhibit B at ¶ 23(b). Venue is further proper in this district under 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to this claim occurred here and because a substantial part of the property that is the subject of this action is situated here.

### General Allegations

8.      On April 17, 2017, Groupon and EDO executed the Option Agreement. See Exhibit A.

9.      Pursuant to the terms of the Option Agreement, EDO granted Groupon the option to purchase EDO's goods that it listed in Groupon's internal inventory system called the Groupon Goods Gateway. *Id.*

10.      EDO expressly agreed in the Option Agreement that the terms and conditions of Groupon's Vendor Agreement are binding upon EDO. *Id.*

11.      The Vendor Agreement provides specific guidelines and requirements for EDO to follow regarding the shipment of any goods that Groupon purchases from EDO. See Exhibit B, Chapter I, pages 2-7; Chapter IV, pages 10-18.

12.      As part of these guidelines, EDO was permitted to use Groupon's FedEx account to ship goods that it sold to Groupon under the Option Agreement subject to the terms and conditions of the Groupon Vendor Agreement. *Id.*

13.      EDO was not authorized to use Groupon's FedEx account to ship non-Groupon goods or products. See Exhibit B. Indeed, EDO agreed that the Groupon FedEx account may only be used for goods sold to Groupon under the Option Agreement. *Id.* at page 23.

14.      EDO agreed pursuant to the Vendor Agreement that its breach or non-compliance with the Vendor Agreement would cause Groupon injury and EDO agreed to pay damages to Groupon as described in Section 10(d) of the Vendor Agreement. *Id.* at page 9.

15.     Section 10(d) of the Vendor Agreement provides, in pertinent part, that EDO shall remit to Groupon the amounts specified in Schedule 4 of the Vendor Agreement for its breach or non-compliance with that agreement. *Id.* at page 13.

16.      Schedule 4 of the Vendor Agreement provides that EDO shall pay Groupon $5 per unit *plus* shipping costs for the shipment of non-Groupon goods on Groupon's account. See Exhibit B, page 22, Schedule 4.

17.     EDO also agreed to indemnify Groupon for all attorneys' fees, costs, and expenses that Groupon incurs due to EDO's breach and/or failure to perform under the parties' Agreements. See Exhibit. B, pages 15-16 at ¶ 16.

18.     Groupon performed all of its obligations under the parties' Agreements.

19.     As part of a shipping audit, Groupon discovered that EDO had improperly shipped approximately 27,932 non-Groupon goods and products on Groupon's FedEx account, totaling unauthorized charges of $525,422.31.

20.     EDO's brazen and repeated unauthorized use of the Groupon's FedEx account for the shipment of non-Groupon goods was facilitated by Minasyan and EDO falsely representing to FedEx that the charges should be billed to Groupon when Minasyan and EDO knew that the goods in question were not being shipped for the fulfillment of Groupon goods or products.

21.     Groupon contacted EDO and Minasyan regarding their extensive unauthorized use of Groupon's FedEx account to ship non-Groupon goods. At no point did EDO or Minasyan dispute that they had repeatedly engaged in the

unauthorized use of Groupon's FedEx account to ship non-Groupon goods. Nor did they dispute the number of unauthorized shipments or the more than $525,000 that Groupon wrongfully incurred due to EDO's and Minasyan's unlawful use of Groupon's FedEx account.

22.     By late spring of 2020, it became clear that EDO and Minasyan refused to repay the amounts that they wrongfully charged to Groupon's FedEx account and that the decision to misuse Groupon's FedEx account was no mere mistake, but instead EDO's and Minasyan's intentional effort to wrongfully have Groupon incur hundreds of thousands of dollars in unauthorized FedEx shipping charges.

23.     As a result of their misconduct, EDO and/or Minasyan owe Groupon substantial damages, including without limitation over $525,000 in fraudulent FedEx charges, $139,660 in non-compliance chargeback recovery fees per Schedule 4 of the Vendor Agreement for the 27,932 non-Groupon shipments made using Groupon's FedEx account, Groupon's attorneys' fees, costs, and expenses related to the fraudulent FedEx charges at issue here, and punitive damages related to Minasyan's fraudulent misconduct.  See Exhibit B, page 22 at Schedule 4.

## Count I - Breach of Contract (EDO)

24.     Groupon incorporates paragraphs 1-23 above as though fully set forth herein.

25.     Groupon fulfilled its obligations under the parties' Agreements.

26.     The parties' agreements prohibit EDO from using Groupon's FedEx account to ship non-Groupon goods and products.  See Exhibit B. EDO breached the parties' Agreements when it shipped  non-Groupon goods and products and charged the amounts to Groupon's FedEx account.

27.     As a result of EDO's breaches, Groupon has suffered damages, including without limitation the $525,422.31 in unauthorized FedEx charges, $139,660 in non-compliance chargeback recovery fees per Schedule 4 of the Vendor Agreement, Groupon's attorneys' fees, costs, and expenses related to the unauthorized FedEx charges at issue here.

28.     EDO's refusal to comply with Groupon's request for payment of these amounts constitute a further breach of the parties' Agreements, as they expressly require EDO to repay these amounts to Groupon.  See Exhibit B, Section IV ¶ 10(d) and Schedule 4.

WHEREFORE, Groupon requests that this Court enter judgment in its favor and against EDO for an amount to be proved at the time of trial that is in excess of Seventy-Five Thousand Dollars ($75,000), together with Groupon's attorneys' fees, costs, and expenses.

## Count II – Common Law Fraud (Minasyan)

29.     Groupon incorporates paragraphs 1-28 above as though fully set forth herein.

30. Minasyan made false statements of material fact when he repeatedly represented to FedEx that Groupon was the party responsible for paying the FedEx shipment fees for non-Groupon goods sold by EDO.

31. Minasyan knew that those statements were false at the time that he made them because the goods and products being shipped were not Groupon goods or products.

32. Minasyan made the foregoing false statements of material fact so that Groupon would pay the shipping costs for the non-Groupon goods and products sold by Minasyan and so that Minasyan's company, EDO, would not have to bear such costs and thus, increase EDO's profits.

33. Based upon Minasyan's false representations that Groupon was the party responsible for paying the FedEx shipment fees for non-Groupon goods sold by EDO, Groupon paid the FedEx shipping charges for over 27,000 non-Groupon goods shipped by EDO and incurred over $525,000 in FedEx shipping charges for these non-Groupon goods.

34. As a result, Groupon has suffered substantial damages, including without limitation over $525,000 in unauthorized shipping charges, and attorneys' fees, costs, and expenses.

35. Moreover, because Minasyan's conduct was willful and wanton, as demonstrated by the more than 27,000 unauthorized shipments that Minasyan caused Groupon to pay, an award of punitive damages here is appropriate to deter Minasyan from engaging in such brazen misconduct and breach of trust.

WHEREFORE, Groupon requests that this Court enter judgment in its favor and against Minasyan for an amount to be proved at the time of trial that is in excess of Seventy-Five Thousand Dollars ($75,000), together with Groupon's attorneys' fees, costs, and expenses.

## Count III – Common Law Fraud (EDO)

36. Groupon incorporates paragraphs 1-35 above as though fully set forth herein.

37. EDO, by and through its CFO and CEO, Minasyan, made false statements of material fact when it repeatedly represented to FedEx that Groupon was the party responsible for paying the FedEx shipment fees for non-Groupon goods sold by EDO.

38. EDO knew that those statements were false at the time that it made them because the goods and products being shipped were not Groupon goods or products.

39. EDO made the foregoing false statements of material fact so that Groupon would pay the shipping costs for the non-Groupon goods and products sold by EDO and so that EDO would not have to bear such costs and thus, increase EDO's profits.

40. Based upon EDO's false representations that Groupon was the party responsible for paying the FedEx shipment fees for non-Groupon goods sold by EDO, Groupon paid the FedEx shipping charges for over 27,000 non-Groupon goods

shipped by EDO and incurred over $525,000 in FedEx shipping charges for these non-Groupon goods.

41.     As a result, Groupon has suffered substantial damages, including without limitation over $525,000 in unauthorized shipping charges, and attorneys' fees, costs, and expenses.

42.     Moreover, because EDO's conduct was willful and wanton, as demonstrated by the more than 27,000 unauthorized shipments that EDO caused Groupon to pay, an award of punitive damages here is appropriate to deter EDO from engaging in such brazen misconduct and breach of trust.

WHEREFORE, Groupon requests that this Court enter judgment in its favor and against EDO for an amount to be proved at the time of trial that is in excess of Seventy-Five Thousand Dollars ($75,000), together with Groupon's attorneys' fees, costs, and expenses.

## Count IV – Conversion (EDO)

43.     Groupon incorporates paragraphs 1-42 above as though fully set forth herein.

44.     As alleged above, EDO engaged in the repeated unauthorized use of the Groupon's FedEx account to ship non-Groupon goods and products. By doing so, Groupon wrongfully incurred over $525,000 in FedEx shipping charges.

45.     Groupon has the right to the more than $525,000 that it paid to FedEx for EDO's unauthorized shipments on Groupon's FedEx account ("Groupon's funds").

46.     Groupon has the absolute and unconditional right to these Groupon funds.

47.     Groupon has made repeated demands for the return and possession of the Groupon funds, including multiple demands that it made in writing to EDO.

48.     EDO wrongfully and without authorization assumed control and dominion over the Groupon funds by falsely representing to FedEx that Groupon was the responsible payor for over 27,000 shipments of non-Groupon goods and products.

49.     As a result of EDO's unlawful conversion of the Groupon funds, Groupon has suffered over $525,000 in compensatory damages. Because EDO's unlawful conversion was willful and wanton, this Court should impose punitive damages against EDO to deter EDO from engaging in willful and wanton misconduct in the future.

WHEREFORE, Groupon requests that this Court enter judgment in its favor and against EDO for an amount to be proved at the time of trial that is in excess of Seventy-Five Thousand Dollars ($75,000), together with Groupon's attorneys' fees, costs, and expenses.

Dated: March 28, 2022                          Respectfully submitted,

                                               By: /s/ *Michael T. Layden*
                                               One of the Attorneys for Plaintiff

Richard J. Prendergast, Esq.
Michael T. Layden, Esq.
David J. Rivelli, Esq.
Prendergast Layden, Ltd.
191 North Wacker Drive, 31st Floor
Chicago, Illinois 60606

(312) 641-0881
rprendergast@rjpltd.com
mlayden@rjpltd.com
drivelli@rjpltd.com

Exhibit A

**GROUPON** Goods

### GROUPON GOODS GATEWAY
### MASTER OPTION TO PURCHASE

**Buyer**       Groupon Goods, Inc., 600 W. Chicago Ave., Chicago, IL 60654

**Seller**      Legal Entity Name: _EDO Trading INC._
                Address: _10216 Norris Ave Unit A  Pacoima, CA 91331_

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby grants to Buyer the option (the "Option") to purchase up to the number of units of Goods, at the Unit Prices, listed by Seller from time to time in the Groupon Goods Gateway, for so long as such Goods remain listed (such period, the "Option Period"). If Buyer exercises the Option, each purchase shall be governed by the terms and conditions of the Groupon Goods Vendor Guide, as amended (the "Vendor Agreement"). Seller acknowledges and agrees that the act of making inventory available to Buyer for purchase via the Groupon Goods Gateway shall constitute and stand in for the execution of an Option to Purchase under the Vendor Agreement, and that Seller shall be bound by the terms of, and be responsible for fulfilling all shipment, delivery and other obligations under, the Vendor Agreement with respect to any Goods purchased by Buyer. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Vendor Agreement. In the event of any conflict or inconsistency between the provisions of this Master Option to Purchase and the Vendor Agreement, the provisions of this Master Option to Purchase shall control and govern.

The terms set forth below shall apply to the purchase, sale and fulfillment of all Goods via the Groupon Goods Gateway, unless otherwise agreed by the Parties.

| | | | |
|---|---|---|---|
| **Country** | USA | **Fulfillment Method** | Drop Ship |
| **Ship From Location** | | **Shipping SLA** | 24 hours after issuance of a Purchase Order |
| **Freight Terms** | N/A | **Freight Allowance** | N/A% |
| **Discount Allowance** | 4% | **Payment Terms** | NET60 |

By signing below, you represent and warrant that you are an authorized representative of Seller and that this Option to Purchase and the Vendor Agreement, as amended, are binding upon Seller and effective as of the date hereof.

**SELLER**

Signature: _[signature]_

Name: _Edward Minasyan_

Title: _CEO_

Date: _4/7/17_

**GROUPON GOODS, INC.**

Signature: _____

Name: _____

Title:   Authorized Signatory

Exhibit B

# GROUPON Goods®
# Vendor Guide

**Version 3.5**

**Last updated October 16, 2017**

**GROUPON** Goods®

## TABLE OF CONTENTS

INTRODUCTION.........................................................................................................................................1

CHAPTER I: SHIPPING INSTRUCTIONS ...............................................................................................2

CHAPTER II: INVOICES AND CUSTOMER SUPPORT.........................................................................8

CHAPTER III: NON-COMPLIANCE COST RECOVERY .......................................................................9

CHAPTER IV: TERMS AND CONDITIONS ..........................................................................................10

SCHEDULES ..........................................................................................................................................18



## INTRODUCTION

*"Groupon", "we" or "us" means Groupon Goods, Inc.*
*"Seller" or "you" means the applicable seller, supplier or vendor.*

In preparation for fulfilling your shipment and delivery obligations in connection with the Option to Purchase and/or Purchase Order between you and Groupon (collectively, "Option and Purchase Documents"), please carefully review and make sure you understand this entire document (this "Vendor Guide").

Our objective is to satisfy our customers with quality products delivered in a timely manner. Accomplishing this requires your assistance and adherence to the timelines and standards set forth in this Vendor Guide.

If you encounter any challenges or issues complying with the standards herein, please notify your Groupon Account Manager as soon as possible, so that he or she can address your concerns.

The Terms and Conditions set forth as Chapter IV of this Vendor Guide ("Terms and Conditions") govern the Option and Purchase Documents (which, together with the Terms and Conditions, will be referred to herein as your "Agreement"). Nothing in the other Chapters of this Vendor Guide is intended to limit any of Groupon's rights or Seller's obligations under your Agreement, unless explicitly stated.

General Items of Note:

- The terms and instructions in this Vendor Guide apply to all products provided by you under the Option and Purchase Documents ("Goods"), whether you are shipping Goods directly to our customers on our behalf or fulfilling orders using our third party logistics provider ("3PL Provider") (respectively, "Drop-Ship Services" and "3PL-Ship Services").

- Seller is responsible for forwarding this Vendor Guide to the necessary parties within your organization.

- We make certain representations to our customers about shipment and delivery time frames, which we rely on Seller to help us fulfill. Early delivery is encouraged, but late delivery is not acceptable.

**GROUPON** Goods®

## CHAPTER I: SHIPPING INSTRUCTIONS

*Please note that Groupon is not responsible for paying any shipping, handling or other fees or charges (including freight) unless explicitly stated in your Agreement. All time periods stated below are our standard requirement – you are responsible for complying with the time periods stated in your Agreement, if different.*

Goods purchased from Seller by Groupon may be shipped and delivered via one of two available methods: Drop-Ship Services or 3PL-Ship Services.

**Drop-Ship Services**

- <u>Drop-Ship Standards</u>.  If Seller is providing Drop-Ship Services (whether Carrier Prepaid, Third Party Bill-To Groupon or LTL Drop-Ship, as set forth in the Option and Purchase Documents), Seller will:

  (i)   Ensure the Goods are received by the applicable carrier by 5:00 pm CST the business day after Groupon's issuance of a Purchase Order (and the necessary Customer Data, as defined in the Terms and Conditions) to Seller (such date and time, the "Drop-Ship Ship-By Date");

  (ii)  Ship the Goods via a carrier service that provides the following:

    a.   Real-time electronic tracking status updates;

    b.   Requires an adult signature for delivery if the Goods have an aggregate retail price in excess of $1,500 and/or contain alcohol or tobacco products, and

    c.   For Drop-Ship Services in connection with LTL/FTL Shipments (as defined below), if utilizing one of Groupon's approved carriers, as provided to Seller via Goods Central (the "Approved Carrier"), and ensure that each LTL/FTL Shipment is delivered to the applicable customer within 5 business days of the customer order date; if utilizing Groupon's LTL/FTL Freight Provider, ensure that each order is prepared for pick up by carrier within 2 business days of order date

  (iii) Provide to Groupon, via electronic means acceptable to Groupon, a complete and accurate list including a valid electronic carrier tracking number for each shipment of Goods, linking each such tracking number with the associated customer's first and last name, by the Drop-Ship Ship-By Date;

  (iv)  Use <u>all</u> and <u>only</u> the packaging and labeling materials and content in connection with the Goods that are provided and/or identified by Groupon or in this Vendor Guide, and comply with the following specifications:

    o   All shipments must include a Groupon branded sticker or tape (Groupon corrugate, polymailers and bubble mailers can be made available upon request); and

    o   Orders for branded packaging materials must be placed at least 7 business days prior to deal feature start date. All branded packaging materials may be obtained by visiting and registering with www.groupongoodspackaging.com.  If Groupon branded packaging materials have been ordered, but do not arrive prior to Groupon's issuance of a Purchase Order, Seller must still ship product by the Drop-Ship Ship-By Date. Lack of Groupon branded packaging materials is not a valid reason for not timely delivering orders as required in your Agreement.

    o   All glass, breakable or otherwise fragile items must be appropriately labeled (e.g., fragile, this end up, etc.) and packaged in protective corrugate boxes to prevent damage.

  (v)   Use <u>all</u> and <u>only</u> the packing slips and returns instructions provided and/or identified via Goods Central or by Groupon or in this Vendor Guide (including, without limitation, in Schedules 1 and 2 hereto); **shipment packaging or labels in connection with the Goods may include only a shipping address or such other information as is provided by Groupon or identified via Goods Central or this Vendor Guide;;**

  (vi)  Unless otherwise approved in advance by Groupon, not include any branding or promotional inserts in or on any packaging or labeling in connection with the Goods, other than as provided and/or identified by Groupon or in this Vendor Guide;

2

**GROUPON** Goods®

(vii) If shipping Third Party Bill-To Groupon under Groupon's account with the applicable carrier (as set forth in the Option and Purchase Documents), (A) ship via such carrier and service as detailed in the Groupon Goods Routing Letter (which Groupon Goods provides to Seller), unless otherwise directed by Groupon, (B) ensure packaging adheres to such carrier's requirements, (C) include the Groupon Goods "parent order id" in Reference Field #1 of such carrier's shipping label (the parent order id is located in the column labeled "parent_order_id" in the order file), (D) enter Groupon Goods Order number(s) (order_num) in Reference Field # 2 of such carrier's label (the order number is located in the column labeled "Groupon_Number" in the order file), and (E) do not enter a "declared value" in connection with any shipment;

(viii) If Seller is providing LTL/FTL Drop-Ship Shipments (defined below) and Groupon's Freight Provider utilize the Bill of Lading provided at the time of delivery (and not Seller's own Bill of Lading); or if Seller is providing LTL/FTL Drop-Ship Shipments using its own carrier, Seller may utilize its own Bill of Lading;

(ix) If Seller is providing LTL/FTL Drop-Ship Shipments using its own carrier, provide to Groupon, via electronic means acceptable to Groupon, a report every 2 business days containing the following information, until fulfillment is complete:

- o Groupon order number
- o Customer name
- o Customer address
- o Customer phone number
- o Description of Goods
- o Pro number
- o BOL number
- o Ship date
    - ▪ Scheduled
    - ▪ Actual
- o Delivery date
    - ▪ Scheduled
    - ▪ Actual
- o Status update, noted as one of the following:
    - ▪ In transit
    - ▪ Appointment scheduled
    - ▪ Refused by customer
    - ▪ Returned
    - ▪ Cancelled
- o Date of customer contact
    - ▪ Date of first attempt
    - ▪ Date of second attempt
    - ▪ Date of third attempt
- o Comments

(x) When shipping via carrier services which partner with USPS, provide the correct carrier code and tracking number to input into the carrier service field in Goods Central, which are the codes and numbers associated with the first carrier (*e.g.*, if shipping via FedEx SmartPost, provide the FedEx carrier service code  and upload the FedEx SmartPost tracking number).

(xi) For all orders with the same parent order identifier (located in the column labeled "parent_order_id" in the order file) (collectively, "Multi-Line Orders"), Seller must consolidate and ship each "line item id" in such Multi-Line Order from the same location, at the same time,  in 1 box (or the fewest number of boxes possible given product size/location); provided, however, that:

a. Seller may ship each "line item id" in a Multi-Line Order from different locations if the inventory to fulfill such Multi-Line Order is held in different locations and shipping each "line item id" together would delay delivery; and

b. If any "line item id" in a Multi-Line Order cannot be filled in full, Seller shall (i) fulfill each "line item id" for which all ordered units are available, (ii) hold each "line item id" for which no/partial units are

3

GROUPON Goods®

available and (iii) fulfill any missed "line item id" separately once all ordered units are available (i.e., Seller should never ship a partial "line item id" in a Multi-Line Order).

(xii) Products that are classified as ORM-D must have MSDS sheets filled out and uploaded to Goods Central prior to deal launch; all appropriate ORM-D shipping labels and stickers are required on the outside of the packaging to comply with carrier regulations

- **LTL/FTL Drop-Ship Shipments.** An "LTL/FTL Shipment" is any shipment that is not considered a "small parcel shipment" by the applicable carrier (LTL being any such shipment that is equal to or less than 20 linear feet, or equal to or less than 20,000 pounds; FTL being any such shipment that is more than 20 linear feet or greater than 20,000 pounds). If Seller is providing Drop-Ship Services via LTL/FTL Shipment (an "LTL/FTL Drop-Ship Shipment"), Seller will:

  o Label and manifest each LTL/FTL Drop-Ship Shipment to a unique shipping address as an individual LTL/FTL Shipment.

  o For any pick-up by 5:00 pm on any day, notify via email by 2:00 pm that day. All pickup windows should be 2 hours and someone over the age of 18 must be available throughout the entire scheduled pickup window. If for any reason a pickup does not happen by the Drop-Ship Ship-By Date, please contact your Groupon Account Manager immediately to discuss next steps.

  o Affix a label to the upper right side of the carton for each carton of Goods.

  o Comply with the "*additional carton guidelines*" and "*additional pallet guidelines*" set forth under "Goods, Carton and Pallet Guidelines" below.

  o Ensure that each LTL/FTL Drop-Ship Shipment is accompanied by a packing list that details the contents of the shipment. **The packing list may not contain any pricing or value information in connection with the Goods.** The following information must appear on each packing list:

    ▪ SHIP FROM (complete name and address of Ship-From Location, as defined in the Terms and Conditions);

    ▪ SHIP TO (complete name and address of the applicable customer);

    ▪ DATE SHIPPED (date product is loaded onto a truck from your shipping location);

    ▪ PURCHASE ORDER INFORMATION (Purchase Order number, description of Goods, UPC(s), carton count, total weight, number of pallets and number of units of Goods); and

    ▪ SHIPPER/CONSIGNEE INFORMATION AND SIGNATURES (including delivery address, contact name and contact information).

  o LTL delivery appointments

    ▪ Delivery appointment must be scheduled by an Approved Carrier on behalf of Groupon (without identification of Seller).

    ▪ Delivery appointments must be made within the 5 business days delivery window, unless the customer is unable to accept delivery within that window. Seller must communicate any exceptions to the Groupon Logistics Team at freight@groupon.com.

    ▪ Tracking number must be uploaded to Goods Central within 5 business days of Groupon's issuance of a Purchase Order.

    ▪ The following home delivery services may be offered for LTL/FTL Drop-Ship Shipments, as set forth in the applicable Purchase Order:

      ➢ One and/or two person delivery;
      ➢ Delivery inside the home to room of choice;
      ➢ Placement in that room;
      ➢ Up or down one flight of stairs;

**GROUPON** Goods®

➤ Debris removal, if applicable; and
➤ Pallet jack and lift gate, if needed.

▪ Additional delivery requirements must be approved by Groupon prior to attempted delivery.

**3PL-Ship Services**

- <u>3PL-Ship Standards</u>. If Seller is providing 3PL-Ship Services, Seller will:

  (i) Ensure pick-up of Goods are routed via Goods Central and then, unless expressly stated otherwise in a Purchase Order, deliver the Goods to Groupon's Freight Provider by 5:00 pm CST two (2) business days after Groupon's issuance of a Purchase Order to Seller (such date and time, the "3PL Ship-By Date");

  (ii) Ensure that the Goods purchased under a Purchase Order are "Ready For Pickup" (as described below) by the 3PL Ship-By Date;

  (iii) Ensure that each individual unit of Goods purchased under a Purchase Order contains an accessible, accurate UPC barcode capable of being scanned;

  (iv) Utilize either the Bill of Lading provided by Groupon's Freight Provider at the time of delivery (and not Seller's own Bill of Lading) and/or the carrier labels provided by Groupon;

  (v) Include a complete and accurate packing list with each shipment;

  (vi) Ship each Purchase Order separately – 1 Purchase Order per pallet (or carton if shipping small parcel);

  (vii) Ship each Purchase Order using Groupon's Freight Provider via Goods Central, unless a pre-paid shipping agreement has been executed; and

  (viii) For all orders with the same parent order identifier (located in the column labeled "parent_order_id" in the order file) (collectively, "<u>Multi-Line Orders</u>"), Seller must consolidate and ship each "line item id" in such Multi-Line Order from the same location, at the same time, in 1 box (or the fewest number of boxes possible given product size/location); provided, however, that:

  a. Seller may ship each "line item id" in a Multi-Line Order from different locations if the inventory to fulfill such Multi-Line Order is held in different locations and shipping each "line item id" together would delay delivery; and

  b. If any "line item id" in a Multi-Line Order cannot be filled in full, Seller shall (i) fulfill each "line item id" for which all ordered units are available, (ii) hold each "line item id" for which no/partial units are available and (iii) fulfill any missed "line item id" separately once all ordered units are available (i.e., Seller should never ship a partial "line item id" in a Multi-Line Order).

If Seller is providing 3PL-Ship Services, Seller further agrees to comply with the following packaging, scheduling and delivery guidelines:

- <u>Goods, Carton and Pallet Guidelines</u>.

  o "Ready for Pickup" means that:

  ▪ No unit of Goods needs to be re-labeled or re-packaged for resale and delivery to customers, other than in connection with outbound shipping materials (e.g., a box, bag or envelope);

  ▪ Each master carton of Goods is clearly labeled with all information necessary to identify the Goods contained within such carton, including the Purchase Order #, applicable UPC(s) (as bar-codes and text), colors and size information, quantity(ies), country of origin, expiration date, lot code, and date of manufacture, where applicable, thereof (and such labeling must be clearly visible and facing outward upon pick-up) (sample attached as Schedule 3); and

  ▪ Each master carton of Goods contains a label affixed to the upper right side of the carton.

  o Please provide full carton quantities. Each carton of Goods with the same UPC must include the same number of units of Goods per carton; provided that, if one carton is a partial, then (i) such carton must be

**GROUPON** Goods·

marked "partial" using a bright colored label that is clearly visible and facing outward upon pick-up, and (ii) such carton must be on the top layer of the pallet.

- o Additional carton guidelines:

  - Each master carton may contain no more than 6 UPCs; provided that, (i) if the Goods are apparel, each master carton may contain no more than 1 UPC and (ii) if the Goods are footwear, each master carton may contain no more than 12 UPCs.

    - If master carton contains multiple UPCs, carton must be marked "mixed" using a bright colored label that is clearly visible and in the upper right corner of the carton.

  - All cartons with mixed UPCs must contain inner packs and individual packing slips per master carton.

  - Each inner pack may contain no more than 1 UPC; all inner packs must be labeled with applicable UPC, quantity and product description.

  - All carton seams must be taped and sealed.

  - Carton may be strapped by using plastic-strapping material only and by using two strips across the width of the carton. Metal strapping may not be used;

  - Each carton must be individually numbered with a carton count to reflect each carton's place out of the total number or cartons (e.g., "1 of 75") to ensure all Goods are accounted for in every stage of the supply chain. For the avoidance of doubt, this requirement applies to all shipments including, but not limited to, small parcel shipments.

  - Mark cartons containing glass, breakable or otherwise fragile items appropriately (e.g., fragile, this end up, etc.), and package all such items in corrugate boxes to prevent damage.

  - Table top and ceramic items must be properly separated with corrugated partitions to prevent such items from hitting each other inside the carton, and to protect from vibration damage. Air cells should also be considered (where applicable) to protect from shock impact.

- o Additional pallet guidelines:

  - All product must be stacked and shrink-wrapped on standard 48" x 40" pallets.

  - All pallets must be built to a maximum height of 58".

  - All pallets must be sorted in such a way that pallets contain the smallest number of different styles/colors of Goods.

  - All pallets must include clearly visible and outward-facing labels, to include # of cartons, UPC(s), product description(s) and quantity(ies).

- o If set forth in the Option and Purchase Documents or Buyer's written instructions, items must be pre-kitted prior to arrival at the 3PL Provider's facility.

  - Items that are purchased pre-kitted must be labeled with the Groupon provided UPC upon arrival.

- Pick-Up Guidelines:

  - o All orders picked up by Groupon's Freight Provider must be accompanied by a packing list that details the contents of the shipment. The following information must appear on each packing list:

    - SHIP FROM (complete name and address of Ship-From Location);

    - SHIP TO (complete name and address of Groupon's or its 3PL Provider's warehouse);

    - DATE SHIPPED (date product is loaded onto a truck from your shipping location);

GROUPON Goods®

- PURCHASE ORDER INFORMATION (Purchase Order number, description of Goods, UPC(s), carton count, total weight, number of pallets and number of units of Goods); and

- SHIPPER/CONSIGNEE NAMES AND SIGNATURES.

○ In loading shipments, pallets must be positioned to face the rear of the trailer, so as to allow for pallet jack entry (no side loaded pallets).

○ Loads must be secured to avoid shifting and damage.

- Trailers not meeting these standards may be refused or charged with special handling rates.

- Applicable fees apply to carton floor loads.

- <u>Third Party Bill to Groupon Shipment Scheduling</u>.

○ You must visit Goods Central by 12:00 PM CST of the 3PL Ship-By Date to verify the Ship-From Location and warehouse point of contact information, to schedule a delivery appointment and complete the requested information. Allow 2-3 hours for processing time from time of form submission, after which, you will receive either UPS labels or a Bill of Lading from Groupon.

- Scheduled pick-up time must be prior to 5:00 PM CST of the 3PL Ship-By Date.

- Must ship complete Purchase Order from one designated Ship-From Location.

○ You will receive reminders from the Groupon Freight team to visit Goods Central to verify the information above every few hours on your 3PL Ship-By Date. If you do not respond after 24 hours, the reminders will escalate. If you do not respond within 48 hours, your Purchase Order may be cancelled.

○ All pick-up windows should be 3 hours; and someone must be available throughout the entire scheduled pick-up window. If for any reason a pick-up does not occur by the 3PL Ship-By Date, please contact your Groupon Account Manager immediately to discuss next steps.

○ All Purchase Orders for ORM-D goods must be accompanied by MSDS sheets and ORM-D stickers on outside of packaging to comply with carrier regulations; MSDS sheets are required to be filled out prior to deal launch

○ Information our 3PL Provider will need from you upon scheduling pick-up:

- Weight of each package of Goods (in lbs.);
- Quantity of packages;
- Piece count (pallets);
- Carton count;
- Delivery date and time frame;
- Complete name and address of origin (i.e., Ship-From Location);
- Origin contact information, such as email and phone numbers;
- Hours of operation;
- P/U #;
- Clear directions or instructions for trucking companies; and
- Additional information and special instructions of any kind (i.e., hazardous material, forklift required, etc.).

- <u>Freight Pre-Paid Shipment Scheduling</u>

○ Seller shall contact freight@groupon.com to set up a delivery appointment within one business day after Groupon's issuance of a Purchase Order, and shall provide Groupon with the following information:
- BOL #/ PO #/Carrier Name
- # of Containers/ # Pallets per container/or if container is floor loaded
- Requested Delivery time slot

**GROUPON** Goods®

## CHAPTER II: INVOICES AND CUSTOMER SUPPORT

**Invoices.**

For each Purchase Order, submit one complete and accurate invoice via Goods Central. All invoices must be submitted within 30 days from email notification of invoice being available, for 3PL-Ship deals, or from feature end date for Drop-Ship deals. Payment inquiries may be sent to Accounts Payable at goodsap@groupon.com.

**Customer Support.**

- We may ask Seller to provide information and/or answer questions about the Goods. Seller will provide such information and answer any questions promptly upon request by Groupon.

- Links to any websites by Seller, other than groupon.com, are not allowed.

- Customer questions and concerns should be directed to Groupon's customer support team. In the event a customer reaches out to the Seller's customer support team, please direct the customer to email support@groupon.com or visit groupon.com/help..

**GROUPON** Goods·

## CHAPTER III: NON-COMPLIANCE COST RECOVERY

When Goods are prepared, labeled, packaged, delivered or otherwise processed in a manner that is out of compliance with, or otherwise in breach of, this Vendor Guide or Groupon's instructions, Groupon may incur losses or expenses as a result of such noncompliance or breach (including with respect to customers, carriers and 3PL Providers). Therefore, in the event of noncompliance or breach, Groupon will deduct from payments due to Seller (or Seller will pay Groupon, if applicable) certain damages, in the manner described in Section 10(c) of the Terms and Conditions.

**GROUPON Goods®**

## CHAPTER IV: TERMS AND CONDITIONS

**1.     General Terms and Conditions.**

(a)     These Terms and Conditions ("Terms and Conditions") govern each Option to Purchase (including any Gateway Master Option to Purchase, each an "Option to Purchase"), each "Purchase Order" or other document to which they are attached or are otherwise specifically referenced (collectively, the "Option and Purchase Documents") and are effective: (i) upon execution of the Option to Purchase by Seller (the "Option to Purchase Effective Date"), as to the Option to Purchase and each Purchase Order issued thereunder (if any); or (ii) if no Option to Purchase is executed, upon execution of a Purchase Order by Seller (the "Purchase Order Effective Date"). These Terms and Conditions, together with the Option and Purchase Documents and any other terms and conditions expressly incorporated by reference herein, constitute the entire agreement between Buyer and Seller. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Option and Purchase Documents.

(b)     "Buyer" shall mean Groupon Goods, Inc.

(c)     "Seller" shall mean the seller, supplier or vendor identified in the Option and Purchase Documents.

(d)     Seller agrees that the Option and Purchase Documents define, among certain other things: (i) the scope of the goods, materials or other items to be provided by Seller ("Goods") and the services to be performed by Seller (including, but not limited to, delivery obligations identified in the Option and Purchase Documents) ("Services"); and (ii) the price(s) to be paid by Buyer to Seller if a Purchase Order is issued by Buyer.

**2.     Resale of Goods.**

(a)     Seller acknowledges and agrees that Buyer shall have the right, in its sole discretion, to market and resell the Goods through www.groupon.com (the "Website"), other distribution channels owned, controlled or operated by Buyer (including, without limitation, emails, mobile applications or other types of electronic offerings) and/or other platforms or distribution channels owned, controlled or operated by Buyer's affiliates or third party business partners, and that Buyer will establish its own resale pricing and terms.

(b)     Within one business day after the Option to Purchase Effective Date or Purchase Order Effective Date, as applicable, Seller will provide Buyer with the following: (i) at least one sample of the Goods, which sample accurately represents the Goods that will be supplied to Buyer or its customers under the Option and Purchase Documents (including any sample of the Goods provided prior to execution of the Option and Purchase Documents, each, a "Sample"); (ii) a Certificate of Origin attesting to the country of manufacture of the Goods; (iii) at least one high quality, high resolution, digital image of the Goods for each UPC set forth in the Option and Purchase Documents, in a form acceptable to Buyer, that conforms to the Image Requirements set forth below (each, a "Qualifying Image"), which does not infringe, misappropriate or otherwise violate any intellectual property right or right of privacy or publicity of any third party, and which Seller has the right to provide to Buyer and to authorize Buyer to use in connection with the promotion and resale of the Goods as set forth herein; and (iv) an electronic copy of any warranty included with the Goods. Each Qualifying Image must be 960 pixels wide and 582 pixels tall at 72dpi, with a horizontal orientation, in a JPEG format, and any logo

appearing in a Qualifying Image must appear in the top left corner (collectively, "Image Requirements"). In addition to any other rights or remedies of Buyer pursuant to these Terms and Conditions or under Applicable Law, in the event Seller fails to provide Qualifying Images that meet the Image Requirements and Buyer's instructions, Seller will promptly pay Buyer the following applicable amount (which Buyer may deduct from amounts otherwise due Seller under the Option and Purchase Documents), calculated based on the number of applicable UPCs for which Seller fails to provide a Qualifying Image: 1-3 UPCs: $500; 4-10 UPCs: $900; 11-20 UPCs: $1,600; or 21+ UPCs: $2,500. Seller acknowledges and agrees that the foregoing amounts are estimates of the actual costs Buyer incurs when Seller fails to provide Qualifying Images and that such amounts are intended as liquidated damages, and not as a penalty.

(c)     Upon Buyer's request, Seller shall provide Buyer with provenance documentation to verify the sourcing and authenticity of the Goods, including but not limited to a full invoice chain evidencing the purchase of the Goods from the manufacturer or an authorized distributor thereof.

(d)     If Seller is providing Drop-Ship Services, Seller acknowledges and agrees to the restrictions on Seller's treatment and use of Customer Data (as defined below) set forth in Section 14 ("Customer Data Restrictions"), and Seller will at all times comply with such Customer Data Restrictions. References to Seller's shipment or delivery obligations herein shall be deemed to refer to Seller's obligations under the Option and Purchase Documents, and Section 6 hereof, upon receipt of a Purchase Order from Buyer, in accordance with these Terms and Conditions, the other chapters of the Vendor Guide (as defined below) and Buyer's instructions. Buyer shall be responsible for all customer support to its customers in connection with the Goods and Services.

**3.     Purchase Orders.**

(a)     If Buyer is providing Drop-Ship Services pursuant to an Option to Purchase, Seller acknowledges and agrees that receipt of customer names and shipping addresses from Buyer shall constitute Buyer's exercise of the Option (in whole or in part) such that Seller is responsible for fulfilling its shipment and delivery obligations and other requirements under the Option to Purchase and these Terms and Conditions. The receipt of such Customer Data shall stand in for and constitute receipt of a Purchase Order under the Option to Purchase and hereunder, except for purposes of Section 5(a) hereof.

(b)     Buyer shall have the right to modify, change or suspend a Purchase Order or any written instructions, including, but not limited to, the scope of Services, the quantity of Goods subject to a Purchase Order or the delivery dates, upon written notice to Seller. The parties acknowledge and agree that certain matters such as material and product releases, changes in delivery dates, delivery or shipment instructions, variances in orders and other similar matters may be sent by Buyer to Seller via email or facsimile. The parties further acknowledge and agree that such communications, and any provision of Goods or Services thereunder, shall be incorporated by reference into the applicable Option and Purchase Documents and shall be subject to these Terms and Conditions.

(c)     During the performance of the Option and Purchase Documents, Seller shall not make any changes in the design,

**GROUPON** Goods·

material, process, procedures or practices affecting Goods or Services to be furnished by Seller without the prior written consent of Buyer.

(d)     Any and all modifications or amendments to these Terms and Conditions shall be in writing and signed by an authorized representative of Buyer. Buyer expressly rejects any additional or inconsistent terms and conditions offered by Seller at any time and not agreed to in writing and signed by Buyer, notwithstanding any payment by Seller.

**4.     Vendor Guide.** Seller agrees to and will comply with all of the terms of the Vendor Guide of which these Terms and Conditions are set forth as Chapter IV (the "<u>Vendor Guide</u>"). Buyer reserves the right, in its sole discretion, to modify any part of the Vendor Guide at any time. Any changes to the Vendor Guide will be effective upon the next Option to Purchase Effective Date or the next Purchase Order Effective Date, whichever is earlier; provided that any Purchase Order issued in connection with an Option to Purchase will be governed by the version of the Vendor Guide in effect as of the applicable Option to Purchase Effective Date.

**5.     Payment Terms and Delivery.**

(a)     Subject to the other provisions of these Terms and Conditions (including, but not limited to, Seller's obligations under Section 6 hereof) and the Option and Purchase Documents, Buyer shall remit to Seller the aggregate, undisputed amount due under a Purchase Order, within the number of days set forth in the Option and Purchase Documents under "Payment Terms" after: (i) if Seller is providing Drop-Ship Services, Buyer's receipt of all electronic carrier tracking numbers and confirmation that all Goods purchased under the applicable Purchase Order have shipped (pursuant to Chapter I of the Vendor Guide); and (ii) if Seller is providing 3PL-Ship Services, Buyer's or its 3PL Provider's receipt of the Goods upon delivery. Notwithstanding the foregoing, if any payment falls due within the last five (5) business days of the month, such payment will be processed on the first business day of the following month. The Discount Allowance and any applicable refunds and credits, in each case as set forth herein, will be deducted from payment due to Seller under a Purchase Order and invoice.

(b)     Unless otherwise set forth in the Option and Purchase Documents, the Unit Price set forth in the Option and Purchase Documents includes all applicable taxes and fees chargeable to Buyer (including, without limitation, any value-added taxes or consumption taxes), except sales taxes, which shall be shown separately where applicable. Buyer shall not incur any charges for packing, crafting, freight, shipping, handling, local cartage or any other charges unless expressly identified in the Option and Purchase Documents. Seller is responsible for clearing the Goods for import, if applicable, and paying any applicable duties, taxes and other fees in connection therewith. Seller is responsible for carriage and insurance costs to the delivery destination.

(c)     Time is of the essence with respect to the provision of Goods and the performance of Services under the Option and Purchase Documents. No acts or omissions of Buyer, including, without limitation, modifications of the Option and Purchase Documents or acceptance of late shipments or deliveries, shall constitute a waiver by Buyer of the foregoing sentence. Any such waiver may be made only in accordance with Section 20.

(d)     Seller shall furnish only the Goods and Services identified in the Option and Purchase Documents and these Terms and Conditions in accordance with the stated price(s) and

shipment and delivery schedule. Seller shall meet Buyer's requirements and comply with Buyer's schedule. Seller shall notify Buyer immediately in writing of any actual or potential delay or threat to delay the timely performance of the Option and Purchase Documents, including with respect to any customer of Buyer.

(e)     Seller will, by the applicable Drop-Ship or 3PL Ship-By Date (as defined in the Vendor Guide), pursuant to these Terms and Conditions, the Option and Purchase Documents, the other provisions of the Vendor Guide and Buyer's written instructions: (i) deliver the Goods to the applicable carrier for shipment to each customer of Buyer ("<u>Drop-Ship Services</u>"); or (ii) deliver the Goods to Buyer or its 3PL Provider by making the Goods available for pickup at the Ship-From Location (as defined below) ("<u>3PL-Ship Services</u>"). Seller will ship the Goods from (if providing Drop-Ship Services), or deliver the Goods to Buyer or its 3PL Provider at (if providing 3PL-Ship Services), the "<u>Ship-From Location</u>" set forth in the Option and Purchase Documents. If Seller is providing Drop-Ship Services, Seller will either, as set forth in the Option and Purchase Documents: (A) ship the Goods under Seller's own account with the applicable carrier ("<u>Carrier Prepaid</u>"); or (B) ship the Goods under Buyer's account with the applicable carrier (as set forth in the Option and Purchase Documents) ("<u>Third Party Bill-To Groupon</u>") and Buyer will be responsible for paying the applicable shipping fees to such carrier; provided, however, that Seller will reimburse Buyer for any charges or fees arising out of or in connection with: (I) Seller's failure to comply with Seller's obligations hereunder or under the other provisions of the Vendor Guide or Buyer's instructions, and/or (II) Seller's acts or omissions. If Seller is providing 3PL-Ship Services, Seller is responsible for the cost of transport to Buyer's 3PL Provider by the applicable carrier (the "<u>Freight Provider</u>"). Seller will either pay for such shipment directly ("<u>Freight Prepaid</u>") or Buyer will have a discount on the Unit Price of the Goods by 2% thereof ("<u>Freight Collect</u>", and such 2%, the "<u>Freight Allowance</u>"), as set forth in the Option and Purchase Documents. For the avoidance of doubt, Seller shall not be entitled to reimbursement for shipping costs in the event that Seller fails to use the fulfillment specified in the applicable Option and Purchase Documents.

(f)     Seller acknowledges and agrees that: (i) Seller will owe to Buyer the amounts set forth in Section 10(c) in the event Seller breaches the applicable packaging, labeling, delivery and other guidelines, as applicable (in each case, as set forth in Chapter I of the Vendor Guide); and (ii) Buyer may deduct from future payments due to Seller any amounts owed by Seller to Buyer under this Vendor Guide or under prior agreements between the parties (including, without limitation, in connection with Out of Compliance or defective Goods and Services and under Sections 6-8, 10, 11 and 16), either at once or as such amounts are incurred.

**6.     Standards.** Seller represents and warrants to Buyer that Seller will comply with and satisfy the requirements for properly performing the Drop-Ship Services or 3PL-Ship Services, as applicable, as set forth in Chapter I of the Vendor Guide.

**7.     Invoicing.** Each invoice must be submitted in accordance with the instructions set forth in Chapter II of the Vendor Guide. Seller shall: (a) attach proof of shipment to each applicable invoice; and (b) mark each invoice with the Purchase Order number, description, item number (UPC), quantity of Goods and Unit Price. Unless otherwise agreed in writing by the parties, subject to the other provisions of the Option and Purchase Documents and these Terms and Conditions, payment shall be due to Seller after Buyer's, its 3PL Provider's

11

**GROUPON** Goods®

or its customers' (as applicable) receipt of the Goods and Services ordered, the items set forth in the Option and Purchase Documents and Section 6 hereof, Seller's complete and accurate invoice and all applicable shipping documents. Seller shall be paid in the currency set forth in the Option and Purchase Documents. Payment of amounts due under the Option and Purchase Documents pursuant to Seller's invoices is subject to (A) Seller's fulfilling its obligations under the Option and Purchase Documents and Sections 5(e) and 6 hereof (and Buyer's timely receipt of the items set forth therein), and Buyer's instructions; and (B) inspection and acceptance of the Goods and Services by Buyer or its customers and adjustments for shortages or defective or Out of Compliance (as defined below) Goods or Services. Groupon reserves the right to seek reasonable assurances of Seller's financial stability at any time during the period beginning on the Option to Purchase Effective Date or Purchase Order Effective Date, as applicable, and ending 180 days thereafter, including through bank reference notes and credit reports.

**8.    Discount Allowance.** Unless otherwise agreed in the Option and Purchase Documents, Seller shall provide Buyer with a "Discount Allowance" to offset the cost of potential returns by Buyer's customers, pursuant to which Buyer will have a discount on the Unit Price of the Goods by a percentage thereof, as set forth in the Option and Purchase Documents under "Discount Allowance". Notwithstanding the foregoing, Seller shall be responsible for refunds as otherwise set forth herein, including, but not limited to, by reason of (a) Out of Compliance or defective Goods or Services, or (b) breach of Seller's warranties hereunder. For the avoidance of doubt, Buyer shall be responsible for managing and processing the return of Goods from Buyer's customers and no Goods will be returned to Seller unless otherwise provided hereunder.

**9.    Samples; Packaging; Shipping; Records and Tracking.**

(a)    With respect to any Samples provided to Buyer, whether before, on or after any Option to Purchase Effective Date or Purchase Order Effective Date, Seller represents and warrants that it has full right, title and interest in and to the Samples (prior to Buyer's receipt thereof) and Seller's submission thereof does not and will not violate the rights of any third party. Seller acknowledges and agrees that (i) title to the Samples passes (or passed) from Seller to Buyer upon receipt thereof by Buyer; (ii) Buyer may use the Samples in its sole discretion for any purpose whatsoever; (iii) Seller has not and will not submit any Samples which cannot be replaced, or which Seller desires to be returned; and (iv) Buyer is not responsible for the handling, arrival or return of any Samples and has no obligation, liability or responsibility to return, pay for or otherwise compensate Seller for any Sample sent to Buyer.

(b)    Seller shall not charge Buyer for packaging or storage. All Goods shall be packaged, marked and otherwise prepared in accordance with the requirements specified by Buyer (in the Vendor Guide and otherwise) and, at all times, good commercial practices.

(c)    Buyer shall notify Seller as to where and under what conditions the Goods are to be made available and delivered, if different than set forth in the Option and Purchase Documents. Seller shall at all times comply with Buyer's written instructions. Any deliveries or shipments that do not comply with the Vendor Guide and Buyer's written instructions may be returned or held by Buyer or its 3PL Provider, subject to Buyer's instructions, at Seller's risk and expense.

(d)    Following issuance of a Purchase Order by Buyer, title to, and risk of loss of, the Goods shall pass from Seller to Buyer upon Seller's delivery of the Goods to:

(i)    the applicable carrier, if Seller is providing Drop-Ship Services; or

(ii)    Buyer or Buyer's 3PL Provider, if Seller is providing 3PL-Ship Services.

(e)    Seller will at all times comply with its obligations under the Option and Purchase Documents, and Sections 5(e) and 6 hereof, and will provide to Buyer the items set forth therein within the applicable time periods. Further, Seller will, via electronic means acceptable to Buyer, (i) complete and return to Buyer, promptly following receipt of a shipment confirmation form from Buyer, the complete and accurate shipment confirmation form, signed by an authorized signatory of Seller; and/or (ii) return to Buyer, upon Buyer's request, any Purchase Order issued by Buyer in connection with an Option to Purchase, signed by an authorized signatory of Seller.

**10.    Audit and Inspection.**

(a)    All Goods and Services shall be subject to inspection and acceptance by Buyer before, during and after shipment, delivery or performance. Without limiting any of Buyer's rights or Seller's obligations hereunder, inspection by a customer of Buyer upon or after shipment or delivery of the Goods or before, during or after performance of the Services shall constitute inspection of the Goods or Services by Buyer for purposes of these Terms and Conditions. In addition to any other rights Buyer may have: (i) if Goods are found to be out of compliance with the Option and Purchase Documents, these Terms and Conditions, or under the other provisions of the Vendor Guide, Seller's representations and warranties, a Sample (if any) and/or Buyer's written specifications or instructions, and/or found or alleged by a credible source to be in violation of Applicable Law (as defined in Section 15 below) and/or found or alleged by a credible source to infringe, dilute, misappropriate or otherwise violate any intellectual property law or right of privacy or publicity (in each case, "Out of Compliance"), Buyer shall have the right to return such Goods to Seller for correction, replacement, credit or refund, as Buyer may direct and at Seller's expense; and (ii) if the Services are found to be Out of Compliance, Seller shall, at Buyer's option, either refund to Buyer the amount paid for the Services or perform the Services again at no expense to Buyer or any customer in a proper manner to provide Buyer and each applicable customer with the result originally contemplated by Buyer. Cost of inspection, storage, shipment, transportation, repacking or reinspection by Buyer or any customer in connection with Out of Compliance Goods shall be at Seller's expense, and Seller shall pay any such amount to Buyer immediately upon notice thereof. In addition to Buyer's other rights and remedies, if an inspection discloses that part of the Goods or Services received were Out of Compliance, Buyer shall have the right to cancel any unshipped or unrendered portion of the Purchase Order. Payment for Goods or Services prior to inspection, even if such prior payment was made to obtain a discount, shall not constitute acceptance thereof and shall be without prejudice to any and all claims that Buyer may have against Seller.

(b)    Buyer's or any customer's failure to inspect does not relieve Seller of any responsibility to furnish the Goods and perform the Services in accordance with the Option and Purchase Documents and these Terms and Conditions. Acceptance of all or any part of the Goods or Services provided hereunder shall not be deemed to be a waiver of Buyer's right either to cancel or to return all or any portion of the Goods or

12

**GROUPON** Goods®

Services because the same are Out of Compliance or by reason of defects (latent or patent) or other breach of warranty.

(i) Buyer will accept only the exact items and quantities of Goods set forth in the applicable Option and Purchase Documents. If Seller ships to Buyer, or its 3PL Provider, Goods in excess of the number of units identified in the applicable Option and Purchase Documents or other products not identified in such Option and Purchase Documents ("Excess Inventory"), Buyer shall provide Seller with notice of rejection in writing ("Rejection Notification"). Seller shall respond to such Rejection Notification within three (3) days and, within five (5) additional days, provide Buyer with Seller's logistics provider's account number and an address where Buyer shall return Excess Inventory ("Return Shipment Information"). If Seller fails to provide such Return Shipment Information to Buyer within the timeframe identified herein, Seller acknowledges and agrees that all right, title, and interest in the Excess Inventory shall transfer immediately to Buyer. Without limiting the foregoing, Buyer shall have no obligation to pay for Excess Inventory subject to a Rejection Notice or any expenses related to storage, repacking, or shipment of such Excess Inventory, which shall be at Seller's expense.

(c) If the size, dimensions or weight of the Goods represented by Seller (in the Option and Purchase Documents or otherwise) is inaccurate, Seller will remit to Buyer, immediately following notice, the difference between: (I) any shipping and logistics costs actually paid or due by Buyer (to a carrier, 3PL Provider or otherwise), and (II) the expected shipping and logistics costs based on Seller's representations. Further, in the event Seller fails to fulfill its obligations under the Option and Purchase Documents, these Terms and Conditions, or other part of the Vendor Guide for any reason, Seller will remit to Buyer, immediately following notice, for each affected unit of Goods, the amounts specified in Schedule 4, attached hereto, for the identified breach. Such liquidated damages will be assessed based on Buyer's audit. Seller acknowledges and agrees that any breach of its obligations hereunder may expose Buyer to losses, and that the potential damages would be difficult to calculate. Accordingly, Seller acknowledges and agrees that the amounts set forth or referenced in this Section 10(c) are intended as liquidated damages and not as a penalty. The provisions of this Section 10(c) are in addition to any other rights or remedies of Buyer pursuant to these Terms and Conditions or under Applicable Law.

**11.    Term and Termination.**

(a) The term of these Terms and Conditions shall commence on the date of the earliest Option and Purchase Documents and, unless terminated earlier in accordance with these Terms and Conditions, shall expire upon: (i) if Buyer does not exercise its Option in connection with an Option to Purchase, the end of the Option Period; or (ii) if Buyer issues a Purchase Order in connection with an Option to Purchase or Seller signs a Purchase Order not in connection with an Option to Purchase, Seller's completion of its obligations under the Option and Purchase Documents and Buyer's payment to Seller of all undisputed amounts due.

(b) Buyer may terminate any Option and Purchase Documents in whole or in part at any time upon written notice to Seller.

(c) In the case of termination by Buyer of all or any part of a Purchase Order without cause, Buyer shall pay an amount to Seller due for Seller's obligations to any third parties that Seller can prove by written documentation were entered into: (i) prior to the date of such termination, and (ii) in reliance on a Purchase

Order, and that Seller cannot cancel or otherwise make use of the ordered Goods or Services; provided that such amount will not exceed, in any case, the remaining payment(s) that would have been made under a Purchase Order, and subject further to the requirements and limitations set forth in this Section 11 and the other provisions of these Terms and Conditions. The foregoing is Seller's sole and exclusive remedy in the event Buyer terminates all or any part of a Purchase Order without cause.

(d) If: (i) Seller fails to furnish the Goods or perform the Services on or before the shipment or delivery date specified by Buyer or otherwise fails to comply with the Vendor Guide or Buyer's written instructions in connection with the shipment or delivery of the Goods and Services; (ii) Seller breaches any term, provision, warranty, representation, obligation, covenant or condition of the Option and Purchase Documents or these Terms and Conditions; (iii) Seller fails to make progress as to endanger performance of its obligations under the Option and Purchase Documents in accordance with their terms; (iv) Seller ceases to conduct its operations in the normal course of business (including inability to meet its obligations as they mature); (v) any proceeding under the bankruptcy or insolvency laws is brought by or against Seller; (vi) a receiver for Seller is appointed or is applied for; or (vii) an assignment for the benefit of creditors is made by Seller; then, without limiting any other right or remedy provided by the Option and Purchase Documents and these Terms and Conditions, or by law or in equity, Buyer shall have the right to terminate the Option and Purchase Documents, in whole or in part, by written notice to Seller without liability to Buyer except for Goods or Services previously delivered to and accepted by Buyer or Buyer's customers under a Purchase Order, subject to any rights of Buyer due to breach of warranty or the provision of defective or Out of Compliance Goods or Services.

(e) Upon the termination of a Purchase Order, in whole or in part, by Buyer for any reason, with or without cause, Seller shall, and shall cause any Subcontractor (as defined below) to, immediately: (i) cease furnishing any Goods and performing any Services hereunder; and (ii) preserve and protect (A) any Goods on hand, purchased for or committed to based on a Purchase Order or (B) Services in progress and materials on hand purchased for or committed to based on a Purchase Order, pending Buyer's instructions. Buyer may, in its sole discretion, take possession of all Goods and Services in progress. Seller shall not be paid for any Goods procured or Services performed after Seller's receipt of the notice of termination. Seller shall be obligated to mitigate all damages, including, without limitation, by not incurring costs that could reasonably be avoided and by consuming or selling to others, in its ordinary course of business, Goods or materials used to manufacture Goods or perform the Services.

(f) Seller's obligations under Sections 10 through 18, 20, 23 and 24, and any other section of these Terms and Conditions intended or required to survive the termination or expiration of the Option and Purchase Documents or these Terms and Conditions in order to achieve its full effect, shall survive any expiration or termination of the Option and Purchase Documents or these Terms and Conditions.

**12.    License.** Seller hereby grants to Buyer a non-exclusive, worldwide, royalty free, fully paid-up, perpetual, irrevocable, transferable and sublicensable license and right to use, modify, reproduce, sublicense, publicly display, distribute, broadcast, transmit, stream, publish and publicly perform: (a) Seller's name, logos, trademarks, service marks, domain names, and any audiovisual content, video recordings, audio

**GROUPON** Goods·

recordings, photographs, graphics, artwork, text and any other content provided, specified, recommended or directed to use by Seller (including, without limitation, the Qualifying Image(s), if applicable) (collectively, "Seller IP"); and (b) any third party's name, logos, trademarks, service marks, domain names, audiovisual recordings, video recordings, audio recordings, photographs, graphics, artwork, text and any other content provided, specified, recommended or directed to use by Seller (including, without limitation, the Qualifying Image(s), if applicable) (collectively, "Third Party IP"), in each case in connection with either the promotion and/or resale of the Goods and Services in any and all media or formats now known or hereinafter developed (the "License"). Seller acknowledges that any use of the Seller IP or Third Party IP as contemplated herein is within the sole discretion of Buyer and Buyer may decide not to use the Seller IP or Third Party IP at all.

**13.    Confidentiality.**   Seller agrees that each of: (a) the Option and Purchase Documents, these Terms and Conditions and the other chapters of the Vendor Guide (to the extent the Vendor Guide is not made public by Buyer), (b) all materials, documents and information provided to it by or on behalf of Buyer or an affiliated entity of Buyer that is marked "confidential" or with a similar designation or that Seller should reasonably expect to be confidential or proprietary under the circumstances and/or given the nature of the materials, documents and information, and (c) all materials developed by or on behalf of Seller for Buyer or an affiliated entity of Buyer is and shall be considered Buyer's confidential information (collectively, the "Buyer Confidential Information"). Seller agrees to keep (and ensure that each Subcontractor keeps) Buyer Confidential Information confidential. In no event will Seller use less than the degree of care and means that it uses to protect its own information of like kind, but in any event not less than reasonable care, to prevent the unauthorized disclosure of the Buyer Confidential Information to third parties. Seller agrees not to disclose or use the Buyer Confidential Information except for purposes of shipping or delivering the Goods and providing the Services hereunder. If Seller becomes aware of any unauthorized use or disclosure of Buyer Confidential Information, Seller shall promptly and fully notify Buyer of all facts known to it concerning such unauthorized use or disclosure and shall cooperate with Buyer so that Buyer may seek a protective order or other appropriate remedy to protect such Buyer Confidential Information. Upon Buyer's written request or the termination of any Option and Purchase Documents, Seller shall return to Buyer or destroy, at Buyer's option, all Buyer Confidential Information in Seller's or any Subcontractor's possession. ***Without limiting the foregoing, Seller agrees that it shall not issue any press release or other public statement relating to its relationship with Buyer, the Option and Purchase Documents or these Terms and Conditions without the express prior written consent of Buyer.***

**14.    Intellectual Property Rights and Customer Data Restrictions.**

(a)    Seller acknowledges and agrees that, as between the parties, Buyer owns all right, title and interest in and to the Website, Buyer trade names, logos, trademarks, service marks, domain names, social media handles, all data collected through or from the Website (including, but not limited to, Customer Data), all audiovisual content, video recordings, audio recordings, photographs, graphics, artwork, text or any other content created by Buyer or at Buyer's direction pursuant to a Work for Hire agreement, or assigned to Buyer, and any materials, software, technology or tools used by Buyer to promote, resell or distribute the Goods and conduct its business

in connection therewith (collectively the "Buyer IP"). Seller shall not use, sell, rent, lease, sublicense, distribute, broadcast, transmit, stream, place shift, transfer, copy, reproduce, download, time shift, display, perform, modify or timeshare the Buyer IP or any portion thereof, or use such Buyer IP as a component of or a base for products or services prepared for commercial use, sale, sublicense, lease, access or distribution. Seller shall not prepare any derivative work based on the Buyer IP or translate, reverse engineer, decompile or disassemble the Buyer IP. Seller shall not take any action to challenge or object to the validity of Buyer's rights in the Buyer IP or Buyer's ownership or registration thereof.

(b)    Except as specifically provided herein, Seller may not use, nor may it authorize any third party assisting Seller with its obligations hereunder (each such third party, a "Subcontractor") to use, Buyer IP in any medium without prior written approval from an authorized representative of Buyer. Seller may use, and may authorize its Subcontractors to use, Customer Data (if any is provided hereunder) for the sole purpose of fulfilling its obligations hereunder. Buyer shall exclusively own any Customer Data. Seller expressly agrees that any Customer Data that may be provided hereunder is being provided solely to facilitate the provision of the Goods and Services to Buyer or its customers, and may not be used to enhance a file or list owned by Seller, any Subcontractor or any third party. Seller represents and warrants that it will not, nor will it permit any Subcontractor to, resell, broker or otherwise disclose any Customer Data to any third party, in whole or in part, for any purpose whatsoever. Seller agrees that it will not copy or otherwise reproduce any Customer Data, other than for the purpose of providing Goods and Services to Buyer or its customers as directed by Buyer in connection with the Option and Purchase Documents and these Terms and Conditions. For purposes of the Option and Purchase Documents and these Terms and Conditions, restrictions on Seller's use of Customer Data do not apply to data from any customer who is already a customer of Seller prior to the effective date of these Terms and Conditions, to the extent such data was previously provided to Seller by such customer.

(c)    If Seller engages any Subcontractor to facilitate its obligations hereunder and under the Option and Purchase Documents, Seller shall use commercially reasonable measures to ensure that such Subcontractor implements and complies with reasonable security measures in handling any Customer Data, and if such information is collected directly by the Subcontractor, that it adopts, posts and processes the Customer Data in conformity with its posted privacy policy.

(d)    "Customer Data" means any and all identifiable information about Buyer's customers generated or collected by Buyer or Seller (including, but not limited to, any customer names, phone numbers and shipping addresses provided to Seller to facilitate provision of Goods and Services under the Option and Purchase Documents and these Terms and Conditions).

**15.    Representations and Warranties.**

(a)    In addition to all other express or implied warranties, Seller warrants that: (i) Seller conveys full right, title and interest in and to the Goods, free of any liens or encumbrances, upon delivery of the Goods to the applicable carrier or Buyer or its 3PL Provider, as set forth in Section 9(d); (ii) Seller is either the manufacturer or an authorized reseller of the Goods; (iii) the description of the Goods and all other information provided by Seller with respect to the Goods (including, without limitation, any weight, dimensions, or advertising copy) is materially complete and accurate in all respects, the Goods are genuine,

**GROUPON** Goods®

authentic, manufactured under license from the trademark owner, bona fide products, any Samples are complete and accurate representations of the Goods to be provided hereunder in all respects, and Seller has the full right, power and authority to sell the Goods to Buyer and authorize Buyer to promote and resell the Goods; (iv) the Goods are free from defects in workmanship, materials and design; (v) the Goods will be furnished in accordance with and conform to the Option and Purchase Documents, the Vendor Guide and Buyer's written instructions, specifications, drawings and descriptions in all respects; (vi) the Goods are merchantable and suitable for the purposes, if any, which are stated in the Option and Purchase Documents and in conformity with all other requirements of the Option and Purchase Documents; (vii) the Services shall be performed, and the Goods (and any Samples) shall be manufactured, stored, packaged, labeled, supplied and delivered or shipped (as applicable), in accordance with the Groupon Vendor Code of Conduct and all applicable international, federal, state and local laws and all executive orders and rules and regulations issued thereunder, including but not limited to the Tariff Act of 1930 as amended, regulations issued or enforced by U.S. Customs and Border Protection, the Export Administration Act of 1979, as amended, the Export Administration Regulations, the International Emergency Economic Powers Act, Executive Orders of the President regarding embargoes and restrictions on trade with designated countries and persons, the embargoes, restrictions and regulations administered by OFAC, the antiboycott regulations administered by the U.S. Department of Commerce and the U.S. Department of the Treasury, and the laws and regulations of governments or agencies of other countries relating to the same subject matter as the U.S. statutes and regulations described above (collectively, "Applicable Law"); (viii) unless otherwise specifically stated in the Option and Purchase Documents, none of the Goods furnished hereunder are (A) government or commercial surplus, (B) used, remanufactured or reconditioned, or of such age or so deteriorated, as to impair the usefulness or safety thereof, or (C) subject to a governmental or consumer safety recall; and (ix) Seller shall notify Buyer should any of the foregoing representations and warranties change following the execution of the Option and Purchase Documents.

(b)        With respect to the Services, in addition to any express or implied warranties, Seller warrants that: (i) Seller possesses the requisite expertise, facilities, equipment and personnel necessary and appropriate to perform the Services; (ii) such Services shall be in conformance with Buyer's specifications (including, without limitation, as set forth in the other chapters of the Vendor Guide); and (iii) such Services shall be performed in a safe and workmanlike manner.

(c)        Without limiting any of the foregoing, if Seller is responsible for the design of any Goods according to performance specifications established by Buyer, Seller warrants that the Goods will be fit and sufficient for the purposes intended by Buyer.

(d)        Seller represents and warrants that Seller: (i) currently has in stock, and will have in stock at least through the Option Period (if applicable) and otherwise as required in order to fulfill its obligations under any Option and Purchase Documents, a number of units of Goods equal to or greater than the number specified in the Option and Purchase Documents; (ii) is able to and will (if Buyer issues a Purchase Order) make available and deliver the Goods, as set forth in the Option and Purchase Documents and herein, on or before the applicable Drop-Ship or 3PL Ship-By Date, pursuant to the Option and Purchase Documents, the Vendor Guide and Buyer's written instructions; (iii) is able to and will timely fulfill its obligations set forth in the

Option and Purchase Documents, as applicable, and in Sections 5(e) and 6 hereof; and (iv) if Seller is unable to fulfill its obligations under these Terms and Conditions or the applicable Option and Purchase Documents at any time for any reason, it will immediately notify Buyer and take prompt action to remediate such failure.

(e)        Seller represents and warrants that: (i) Seller owns all right, title and interest in and to the Seller IP and has licensing rights in (with the right to sublicense to Buyer) the Third Party IP, and has the right to grant the License set forth in Section 12; (ii) the Seller IP and the Third Party IP and Buyer's use thereof, shall not infringe, dilute, misappropriate or otherwise violate, anywhere in the world, any copyright, logo, trademark, service mark, trade name, rights in design or other intellectual property right or right of privacy or publicity of any third party or any Applicable Law; (iii) the sale, use or incorporation into manufactured products of all Goods and Services shall not infringe, dilute, misappropriate or otherwise violate, anywhere in the world, any U.S. or foreign letters patent, copyright, logo, trademark, service mark, trade name, rights in design or other intellectual property right or right of privacy or publicity of any third party, and does not and will not result from the misappropriation of any trade secret or the breach of any confidentiality obligations to any person or entity; (iv) the Goods, any components and Samples thereof and any packaging and labeling related to the Goods and the Samples shall not infringe, dilute, misappropriate or otherwise violate, anywhere in the world, any patent, copyright, logo, trademark, service mark, trade name, trade secret, rights in design or any other intellectual property right or right of privacy or publicity of any third party; and (v) the Goods and any Samples comply in all respects with all Applicable Law pertaining to their design, manufacture, packaging, labeling and importation, including, without limitation, the certification, labeling and testing requirements of the Consumer Product Safety Improvement Act of 2008.

(f)        The warranties herein cover Buyer, its affiliated entities and their respective customers. No warranties shall be deemed disclaimed or excluded unless agreed to in writing by an authorized representative of Buyer. Buyer's approval of designs furnished by Seller shall not relieve Seller of its warranties under this Section 15.

(g)        Each of Buyer and Seller represents and warrants that it has the full power and authority to execute and deliver the Option and Purchase Documents and these Terms and Conditions and perform its covenants, duties and obligations described therein and under these Terms and Conditions.

(h)        The foregoing warranties, and all other warranties express or implied, shall survive shipment, delivery, final acceptance and payment.

(i)        Seller shall promptly notify Buyer if Seller receives any cease and desist letter, demand letter, infringement claim, or if Seller has been or becomes the subject of any threatened or pending litigation, with respect to the Goods.

**16.        Indemnification.**  Seller shall indemnify, defend and hold harmless Buyer, its affiliates and its and their respective directors, officers, managers, shareholders, members, employees, agents, successors, assigns and customers and users of the Goods from and against any and all claims, causes of action, suits, actions, costs, expenses, penalties, liabilities, judgments or losses of any kind (including, but not limited to, all attorneys' fees, costs and expenses) directly or indirectly arising out of or resulting from: (a) a breach or alleged breach by Seller, its affiliated entities or any of their respective directors, officers,

GROUPON Goods·

employees, agents, contractors or licensees of any representation, warranty or covenant under the Option and Purchase Documents or these Terms and Conditions; (b) the performance, failure to perform, or alleged performance or failure to preform of Seller or Seller's agents, employees or Subcontractors under the Option and Purchase Documents or these Terms and Conditions; (c) any act or omission or alleged act or omission of Seller, its agents, employees or Subcontractors; (d) the Goods, including, but not limited to, any claims alleging false or deceptive advertising (to the extent such advertising was developed in reliance on representations or materials provided by Seller or its agents or employees), product defects, personal injury, death or property damages (including, without limitation, due to (i) infestation or contamination, (ii) any actual or alleged failure to provide adequate warnings, labels or instructions, (iii) any actual or alleged improper construction or design of the Goods, or (iv) any actual or alleged failure of the Goods to comply with specifications or with any express or implied warranties of Seller); (e) any claim by a third party alleging that the Seller IP, the Third Party IP, Buyer's use thereof, the Goods or Services, the results of such Services, or any other products or processes provided under the Option and Purchase Documents are counterfeit or infringe, dilute, misappropriate, or otherwise violate, anywhere in the world, any patent, copyright, logo, trademark, service mark, trade name, trade secret, rights in designs, or other intellectual property right or right of privacy or publicity of any third party, whether such are provided alone or in combination with other products, software or processes; (f) any claim by a third party alleging counterfeiting, infringement, dilution, misappropriation or other violation, anywhere in the world, of any intellectual property right or right of privacy or publicity of any third party, as a result of Buyer advertising or displaying the Goods or Services, or facilitating customers to search for or locate the Goods or Services; (g) Buyer's compliance with, or investigation into, any subpoena, order, police request, garnishment, demand letter, or other request or legal claim relating to Seller, the Goods, and/or the Services that Buyer reasonably believes obligates Buyer to produce documents, information, or testimony (each, a "Legal Request"); provided that, for the avoidance of doubt, Buyer reserves the right to use third-party service providers (including, without limitation, attorneys, electronic discovery vendors, copy services, investigative firms, and test-purchase and product testing firms) to fulfill its obligations with respect to Legal Requests, and Seller shall reimburse Buyer for all fees, costs, and expenses incurred by Buyer in connection therewith; and (h) violation of any law, statute, ordinance, governmental administrative order, rule or regulation relating to the Goods, or to any of its components or ingredients, or to its manufacture, shipment, labeling, use or sale, or to any failure to provide a Material Safety Data Sheet or certification. In addition to its other rights and remedies, Buyer shall have the right to cancel shipment or delivery of any Goods or Services to be provided hereunder to which any claim described in this Section 16 relates and to return to Seller for full credit or refund any such Goods or Services. If the Goods or Services, the promotion, resale, distribution, use or return thereof by Buyer, or the use thereof by Buyer's subcontractors or customers, is enjoined, is threatened by injunction, or is the subject of any legal proceeding, Seller shall, at its sole cost and expense and as directed by Buyer in its sole discretion: (a) (i) substitute fully equivalent non-infringing Goods or Services; (ii) modify the Goods or Services so that they no longer infringe but remain fully equivalent in value and functionality; (iii) obtain for Buyer, its subcontractors or customers the right to continue using the Goods or Services; or (iv) refund all amounts paid for the infringing Goods or Services; and (b) to the extent applicable,

reimburse Buyer for all costs and expenses incurred by Buyer in connection with (i) destroying or holding in quarantine allegedly infringing Goods and (ii) the distribution or shipment of allegedly infringing Goods to a legal rights holder. Buyer maintains the right to control its own defense and to choose and appoint its own defense counsel, regardless of the presence or absence of a conflict of interest between Buyer and Seller. Buyer's right control its own defense includes the right to enter into any settlement in its sole discretion. Seller's duty to defend, indemnify and hold harmless Buyer includes the duty to pay Buyer's fees and costs in connection with Buyer's defense, as well as any settlement or other disposition of any indemnifiable claim hereunder.

**17.     Remedies; Limitation of Liability.**

(a)      The rights of each party hereunder shall be in addition to its rights and remedies at law or in equity.

(b)      IN NO EVENT SHALL BUYER BE LIABLE UNDER ANY THEORY TO SELLER OR SELLER'S EMPLOYEES, AGENTS OR SUBCONTRACTORS, OR ANY THIRD PARTY, FOR ANY INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS) ARISING OUT OF OR IN CONNECTION WITH THESE TERMS AND CONDITIONS OR THE OPTION AND PURCHASE DOCUMENTS, WHETHER OR NOT BUYER WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. NOTWITHSTANDING ANYTHING HEREIN OR IN THE OPTION AND PURCHASE DOCUMENTS TO THE CONTRARY, IN NO EVENT SHALL BUYER'S LIABILITY HEREUNDER OR UNDER THE TERMS AND CONDITIONS EXCEED THE AGGREGATE PURCHASE PRICE OF THE GOODS AND SERVICES.

**18.     Compliance with Law; Gratuities.**

(a)      Seller warrants that the Goods furnished and the Services performed under the Option and Purchase Documents shall be manufactured, sold and performed in compliance with all Applicable Law, including, but not limited to, the Fair Labor Standards Act. Without limiting the foregoing, Seller represents and warrants that it is familiar with and shall comply with: (i) the U.S. Foreign Corrupt Practices Act, which prohibits providing a payment of money or anything of value to a foreign government official, public international organization official, foreign political party, foreign political party official or candidates for such offices, either directly or indirectly, for the purpose of influencing official acts and decisions (including failures to act and decide) in order to assist in obtaining or retaining business or directing business to any entity, and any provisions of local law and Buyer's policies and procedures related thereto; and (ii) all Applicable Laws.

(b)      Seller further represents and warrants that:

(i)      Seller has not offered or given and will not offer or give to any employee, agent or representative of Buyer or any affiliated entity any gratuity with a view towards securing any business from Buyer or any affiliated entity or influencing such person with respect to the terms, conditions or performance of any contract with Buyer (including, but not limited to, any Option and Purchase Documents or these Terms and Conditions). Any breach of the foregoing sentence shall be a material breach of each and every contract between Buyer and Seller, including the Option and Purchase Documents; and

(ii)      Seller has obtained, and will maintain during the term, all applicable regulatory approvals, applications, licenses, requests for exemption, permits or other regulatory authorizations with each applicable regulatory agency and any

16

**GROUPON** Goods®

state or local regulatory body necessary to conduct its business activities to date and to conduct its activities hereunder.

**19.** **Insurance.** Seller shall carry and maintain the following insurance coverage at all times sufficient to cover Seller's obligations under the Option and Purchase Documents and these Terms and Conditions, but at least with the following limits of liability:

(a) Commercial General Liability insurance, including coverage for bodily injury, property damage and personal and advertising injury, with limits of one million ($1,000,000) per occurrence and two million ($2,000,000) in the aggregate;

(b) In lieu of the personal and advertising injury coverage required in the above general liability policy, Seller may satisfy the personal and advertising injury requirement with a professional liability policy that includes Media Liability coverage with limits of at least two million ($2,000,000) per claim and four million ($4,000,000) in the aggregate.

(c) Seller's insurance shall be primary and noncontributory and Seller is responsible for the payment of any and all deductibles or retentions applicable to the required coverage. Seller shall provide no less than sixty (60) days' notice to Groupon of the cancellation of any of the above policies. Upon request, Seller shall deliver certificates of insurance evidencing the above required coverage to Groupon. Groupon may reasonably increase insurance amounts required by providing thirty (30) days' notice to Seller..

**20.** **Waiver; Severability.**

(a) Any waiver of a provision of these Terms and Conditions or the Option and Purchase Documents must be in writing, expressly identify the provision to be waived and signed by an authorized representative of Buyer. Buyer's failure, whether single or repeated, to exercise a right hereunder shall not be deemed to be a waiver of that right and Buyer's delay in exercising a right shall not be deemed a waiver of that or any future right.

(b) If any of the provisions of the Option and Purchase Documents or these Terms and Conditions are held by a court of competent jurisdiction to be unenforceable or invalid, then such provisions will be ineffective to the extent of the court's ruling. All remaining portions of the Option and Purchase Documents or these Terms and Conditions shall remain in full force and effect.

**21.** **Assignment.** Seller may not transfer or assign any rights or obligations due or to become due under these Terms and Conditions or the Option and Purchase Documents (including, without limitation, in connection with a change-in-control) without the prior written consent of Buyer. Buyer may transfer or assign these Terms and Conditions and the Option and Purchase Documents to a present or future affiliate or pursuant to a merger, consolidation, reorganization, change-in-control or sale of all or substantially all of the assets or business to which these Terms and Conditions and the Option and Purchase Documents relate, or by operation of law, without notice to Seller.

**22.** **Nonexclusive Order.** This is not an exclusive agreement. Buyer is free to engage others to perform Services and/or provide Goods the same as or similar to Seller's.

**23.** **Governing Law and Venue; Disputes.**

(a) The validity, interpretation and construction of the Option and Purchase Documents and these Terms and Conditions and all other related matters will be governed and interpreted by the laws of the State of Illinois without regard to its conflict or choice of law principles.

(b) Any disputes arising out of or relating to the Option and Purchase Documents or these Terms and Conditions, or the breach hereof or thereof, the rights granted or obligations undertaken herein or therein, or the Goods or Services hereunder and thereunder, shall proceed in a federal or state court located within Cook County, Illinois. Seller hereby submits to the exclusive jurisdiction of such courts.

**24.** **Interpretation.** The headings in the Option and Purchase Documents and these Terms and Conditions are inserted for convenience of reference only and are not to be considered in the interpretation or construction of the provisions thereof and hereof.

**25.** **Multiple Counterparts; Electronic Transmission.** The Option and Purchase Documents and these Terms and Conditions may be executed in one or more counterparts, each of which may be executed and transmitted by facsimile or other electronic method, and each of which shall be deemed an original, but both of which shall constitute one and the same instrument.

**26.** **[Reserved.]**

**27.** **Payment Claims.** ANY CLAIM ARISING OUT OF OR RELATING TO ANY PAYMENT PAID OR OWED BY BUYER IN CONNECTION WITH ANY OPTION AND PURCHASE DOCUMENTS MUST BE MADE IN WRITING WITHIN 60 DAYS AFTER THE EARLIER OF: (A) INITIAL PAYMENT BY BUYER IN CONNECTION WITH THE APPLICABLE GOODS AND SERVICES, OR (B) SELLER'S FIRST KNOWLEDGE OF THE GROUNDS FOR SUCH CLAIM, AND ALL SUCH CLAIMS NOT SO MADE SHALL BE DEEMED WAIVED BY SELLER.

**28.** **Choice of Language.** The parties acknowledge that they require that this Agreement be drawn up in the English language only. Les parties reconnaissent qu'elles ont exigé que la présente convention soit rédigée en langue anglaise seulement.

**29.** **Transfer of Accounts Receivable.** If at any time prior to payment by Buyer, Seller assigns its account receivables associated with the Goods, Seller shall immediately provide notice to Buyer of such assignment either directly or through its financing or factoring agent. For the avoidance of doubt Buyer shall have no responsibility to any party other than Seller to provide any kind of notice required under this Agreement. Buyer's responsibility shall be solely to Seller. Seller agrees and acknowledges that it shall be responsible for any and all notifications to its financing or factoring agent.

17

**GROUPON** Goods·

## SCHEDULES

**Schedule 1 – Groupon Packing Slips for US & Canada**

**US Packing Slip**

**GROUPON**
Goods·



Groupon Goods, Inc.          groupon.com/goods
1081 Aviation Blvd           groupon.com/support
Hebron, KY 41048             facebook.com/GrouponGoods

**FREE** Shipping | **FREE** Returns·
with $34.99 Purchase

Thanks for shopping with Groupon Goods!
We don't believe in secrets, so feel free to tell all your friends about us.

| Order Date | 04/07/2012 | Bill To | Ship To |
|---|---|---|---|
| | | Lika Tuparty | Mee Tu |
| | | 1 Charing Cross Lane | 1 Charing Cross Lane |
| | | Atlanta, GA 30030 | Atlanta, GA 30030 |
| Order ID | O2163347200000000000 | Shipped Via  FedEx Smart Post | |

| Item Number | Item Description | Quantity |
|---|---|---|
| IOGEAR Gear Power | Leather Case for iPhone w/ built in battery | 1 |

If you're looking for a gift message, you're in the right place:

If you have any questions about your new goods, please contact us at groupon.com/support.
And, if for any reason your new goods don't blow your socks right through your shoes, you can return your purchase within 14 days of receipt
—unless stated otherwise in the offer's Fine Print—by following these simple steps:

 **1** Go to your account
(groupon.com/mygroupons)
and click on the arrow next to
"Track Order", and then select "Return"
to print a prepaid mailing label.**

 **2** Place the unused item
in its original packaging
with all parts, accessories,
and farewell letters.

 **3** Attach the prepaid
mailing label and ship
your goods, postmarked
within 14 days of receipt.

*Free Shipping applies to eligible orders in the U.S. only.
**For Canadian Orders: Contact us at groupon.com/support to request a Return Authorization form and prepaid mailing label.

18


**Canada Packing Slip**



Groupon Goods, Inc.  groupon.com/goods
1001 Petrolia Rd  groupon.com/support
North York, ON M3J 2X7  facebook.com/GrouponGoods



**FREE** Shipping | **FREE** Returns*
with $34.99 Purchase

## Thanks for shopping with Groupon Goods!
We don't believe in secrets, so feel free to tell all your friends about us.

| Order Date | 04/07/2012 | Bill To | Ship To |
|---|---|---|---|
| | | Spenser Strasmore | Dwayne Johnson |
| | | 135 Adelaide St | 4085 Haaglund Rd |
| | | Toronto, Ontario M5H1P6 | Oliver, British Columbia, VOH 1T0 |
| Order ID | O2163347200000000000 | Shipped Via  FedEx Smart Post | |

| Item Number | Item Description | Quantity |
|---|---|---|
| IOGEAR Gear Power | Leather Case for iPhone w/ built in battery | 1 |

If you're looking for a gift message, you're in the right place:

If you have any questions about your new goods, please contact us at groupon.com/support.
And, if for any reason your new goods don't blow your socks right through your shoes, you can return your purchase within 14 days of receipt
—unless stated otherwise in the offer's Fine Print—by following these simple steps:

 1 Go to your account (groupon.com/mygroupons) and click on the arrow next to to "Track Order", and then select "Return" to print a prepaid mailing label.**

 2 Place the unused item in its original packaging with all parts, accessories, and farewell letters.

 3 Attach the prepaid mailing label and ship your goods, postmarked within 14 days of receipt.

*Free Shipping applies to eligible orders in the U.S. only.
**For Canadian Orders: Contact us at groupon.com/support to request a Return Authorization form and prepaid mailing label.

**GROUPON** Goods®

**Schedule 2 – Groupon Packing Slip Style Guide**



**GROUPON** Goods®
**Schedule 3 – Groupon Carton Label**

Single UPC Master Carton Sample:



Multiple UPC Master Carton Sample:



**GROUPON** Goods®
**Schedule 4 – Non-Compliance Chargeback Recovery ("NCCR")**

**1. Drop-Ship Services NCCR**

| NCCR Reason | Explanation | Expense Offset |
|---|---|---|
| Incorrectly shipped on Groupon account | Groupon carrier account may only be used for deals with Drop-Ship (Groupon small parcel) fulfillment method | $5/unit + Shipping Cost |
| Shipping non-compliance | Groupon is not responsible costs above approved freight costs | $5/unit |
| Late drop shipping | Order does not ship within 1 business day of being placed | 10% of COGS + 1% of COGS per day late |
| Late movement after tracking upload | Goods must be shipped on the same day that tracking is uploaded to Goods Central | 10% of COGS + 2% of COGS per day late |
| Missing tracking | Tracking information must be uploaded to Goods Central | 10% of COGS |
| Wrong tracking number uploaded | Each tracking number must correctly reflect shipping details of the order shipped | $5 per order |
| Incorrect reference field data | Seller must transmit correct data under Reference Field #1, as identified in the Drop-Ship standards | $1 per unit |
| Delivered wrong product | Seller must ship the Goods identified in the Option and Purchase Documents | $5/unit + 100% of COGS |
| Empty Package | Seller must ship the Goods identified in the Option and Purchase Documents | $5/unit + 100% of COGS |
| Missing pieces | Seller must ship the Goods as identified in the Option and Purchase Documents | $5/unit |
| Damaged merchandise | Goods must be sufficiently packaged to prevent damage | $5/unit + 100% of COGS |
| Product never shipped | Customer orders are canceled due to age or lack of inventory | 15% of COGS |
| Missing Groupon branding | All Goods must be packaged in Groupon branded packaging | $0.50/order |
| Incorrect packing slip | All shipments must include packing slip that is provided via Goods Central or by Groupon | $0.50/order |
| Incorrect return address (packaging) | All shipments must include Groupon return address on shipping label | $0.50/order + Shipping Costs |
| Seller branding / promotion | Seller may not include any promotional inserts or own branding with Goods shipments | $0.50/order |
| Split Orders | Seller must aggregate orders by order date and | 0-5lbs: $5/box + |

GROUPON Goods

|  | ship in as few boxes as possible | $3 Shipping Cost |
| --- | --- | --- |
|  |  | 5 – 15lbs: $5/box + $6 Shipping Cost |
|  |  | >15lbs: $5/box + $17 Shipping Cost |
| Missing ORM-D labels | Seller must apply ORM-D labels to packaging per carrier guidelines | $.50/order |
| Late Invoicing | Seller must invoice within 30 days from feature end date | $50 per invoice |

| Missing Packing List for LTL/FTL Shipments | Each Purchase Order must be accompanied by a packing list outlining cartons, individual units, and weights | $100 per Purchase Order |
| --- | --- | --- |
| LTL/FTL Shipments, delivered wrong product | Seller must ship the Goods identified in the Option and Purchase Documents | 10% of COGS |
| LTL/FTL Shipments, missing pieces | Seller must ship the Goods as identified in the Option and Purchase Documents | 10% of COGS |
| Seller used their own BOL for LTL/FTL Shipments | Seller must only ship Goods using Buyer supplied BOL via Goods Central when utilizing Groupon's LTL/FTL freight provider | $10 per order |
| Missing tracking, LTL/FTL Shipments | Tracking information must be uploaded to Goods Central | 10% of COGS |
| Late or Wrong Tracking Upload, LTL/FTL Shipments | Tracking is not uploaded into Goods Central within 5 business days, or tracking is incorrect | 10% of COGS |
| Late Delivery Appointment Scheduling | Delivery Appointment Not Scheduled within 5 business days of tracking upload | 10% of COGS |
| Late Invoicing | Seller must invoice within 30 days from feature end date | $50 per invoice |

2. **3PL-Ship Services NCCR**

**GROUPON** Goods·

| NCCR Reason | Explanation | Expense Offset |
|---|---|---|
| Packed Multiple Purchase Orders Together | Each Purchase Order must be shipped separately. Purchase Orders may not be packaged together. | $100 per Purchase Order |
| Product Not Ready on Time | Product must be scheduled and picked up within 2 business days from issuance of Purchase Orders | 10% of COGS + 1% of COGS per day late |
| Shipped Without Scheduling | Purchase Order is shipped by Seller without scheduling shipment in Goods Central | $100 per Purchase Order |
| Unauthorized prepaid shipment | Must have carrier approval before shipping prepaid | $1000 per shipment |
| Seller used their own BOL | Seller must only ship Goods using Buyer supplied BOL via Goods Central | $100 per Purchase Order |
| Shipping non-compliance | Groupon is not responsible for costs above approved freight costs | $100 per Purchase Order |
| Shipped to wrong warehouse | Goods must be shipped to warehouse indicated in the Goods Central and on the Purchase Order | $100 per Purchase Order + Freight Costs |
| Product Never Shipped | Canceled Purchase Order due to lack of shipment scheduling | 15% of COGS |
| Empty Package | Seller must ship the Goods identified in the Purchase Order | $5/unit + 100% of COGS |
| Missing ORM-D Notification | ORM-D items must include appropriate ORM-D labels and required MSDS documentation | $500 per Purchase Order |
| UPCs not labeled correctly | Item must have UPC label, and UPC must match UPC on Purchase Order | $100 per Purchase Order + $.50 per incorrect UPC |
| Mixed Items in Carton | All cartons may contain a maximum of 6 UPCs, except 1 UPC per carton for apparel. Inners must include only 1 UPC | $100 per incident + $20 per affected carton |
| Mislabeled Cartons | Cartons must contain items that are indicated on the carton label | $100 per Purchase Order + $20 per mislabeled carton |
| Poor Supplier Packaging | Goods must be packaged to prevent damage to item or retail packaging | $100 per Purchase Order |
| No Pallets | Floor-loaded shipments will be assessed applicable fees to hand unload | $100 per Purchase Order + $20 per pallet |

**GROUPON** Goods

| | | |
|---|---|---|
| Poor Pallet Packaging | Pallets must be shrink wrapped and less than 58" in height | $100 per pallet |
| Missing Packing List | Each Purchase Order must be accompanied by a packing list outlining cartons, individual units, and weights | $100 per Purchase Order |
| Short Inventory | Seller must send the exact quantity of Goods as specified by Purchase Order | 10% of COGS |
| Shipped Wrong Item | Item does not match description or UPC on Purchase Order | 20% of COGS |
| Damaged merchandise | Goods must be in re-sellable condition | $5 per unit |
| Excess Inventory (>5%) | Seller delivered more than ordered | 10% of COGS of Purchase Order |
| Missing Piece(s) | Kitted or multi-unit items that are missing pieces | 10% of COGS |
| Additional shipping due to shortages | Groupon will not cover shipping costs associated with shortage shipments | $5/unit |
| Unauthorized Kitting | Goods that require kitting that have not been pre-approved | $200 per Purchase Order |
| Late Invoice | Must submit invoice within 30 days from receipt | $50 per invoice |